Rel: July 10, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2026

_____

## CL-2025-1069

_____

## William Desmond, Jr.

## v.

## Meliaha Desmond

### Appeal from Jefferson Circuit Court
### (DR-18-900535.03)

FRIDY, Judge.

William Desmond, Jr. ("the father"), appeals from a judgment of the Jefferson Circuit Court ("the trial court") resolving competing petitions for a rule nisi and for modification of child custody and child support that he and Meliaha Desmond ("the mother") had filed in the trial court. For

the reasons set forth herein, we affirm the trial court's judgment as to the issues of child custody and contempt, and we reverse that portion of the judgment concerning the child-support award.

Background

The parties married in May 2014, and one child ("the child") was born of the marriage in December 2016. On July 26, 2018, the trial court entered a judgment divorcing the parties; that judgment incorporated a settlement agreement the parties had previously executed. The divorce judgment awarded the parties joint legal custody of the child; awarded the mother sole physical custody of the child; and awarded the father visitation on the first, third, and fifth weekends of each month, overnight visitation on the second and fourth Wednesdays of each month, designated holiday visitation, and summer visitation. It further required the father to pay child support of $800 per month through February 2019 and $1,100 per month thereafter, to pay all expenses associated with the child's extracurricular and athletic activities, and to share certain childcare expenses with the mother, while requiring the mother to maintain health-insurance coverage for the child.

Three years later, on July 27, 2021, the trial court entered a modification judgment ("the 2021 modification judgment"), again incorporating an agreement of the parties. That judgment expanded the father's visitation to the first, third, and fifth weekends of each month from 6:00 p.m. on Friday until 8:00 a.m. on Tuesday and on the second and fourth weeks of each month from 6:00 p.m. on Monday until 8:00 a.m. on Tuesday, with the child to be returned to "daycare or school at the end of [the father's] custodial time or to the [m]other, whichever is applicable." That judgment further provided that, beginning in 2022, from June 1 through July 31, the parties were to rotate custody weekly. The trial court also modified the holiday schedule, awarded the father custodial time on the child's birthday, and awarded him additional Thanksgiving visitation. That judgment increased the father's child-support obligation to $1,387.50 per month.

On April 16, 2024, the father filed a verified petition for a rule nisi and a petition for modification of the 2021 modification judgment, alleging that the mother had interfered with his relationship with the child by blocking communications, by failing to notify him of the child's school and extracurricular activities, and by otherwise excluding him

from significant aspects of the child's life. He also alleged that he feared for the child's safety because of the mother's purportedly "erratic behavior" and requested sole legal and sole physical custody of the child, an award of appropriate visitation for the mother, a modification of child support, and an order requiring each party to be individually responsible for the child's after-school and summer-care expenses incurred during that party's custodial periods. The father's petitions began a flurry of petitions and counterpetitions between the parties, with each alleging that the other had engaged in some form of wrongful conduct involving custody and visitation.

At a hearing on September 11, 2024, the parties reached an agreement, pursuant to which the father was given authority to pick up the child from school or after-school care on his custodial days and was to be listed on school and after-school records, designated as an emergency contact, and provided complete access to the child's educational and attendance records, including through the school's electronic systems. On October 11, 2024, the trial court entered a pendente lite order incorporating the agreement. The day before the trial court entered the pendente lite order, however, the mother filed an

emergency motion for pendente lite relief relating to counseling, the child's welfare, and the father's visitation rights pending a final hearing. The parties then resumed their pattern of filing numerous motions and responses against each other related to the custody of the child. Those motions remained pending until the trial, which the trial court held over three days in March and May 2025.

At the trial, the mother testified that the child was in the second grade at a school in Blount County and that the parties resided approximately sixteen minutes apart within the same school district. She said that, before beginning elementary school, the child had attended daycare. The mother testified that she had remained in the same residence since the entry of the 2021 modification judgment and that no significant changes had occurred in her residence or living arrangements since that time. She testified that her fiancé ("the fiancé") had resided with her since October 2018 and continued to reside with her at the time of trial. She testified that she and the fiancé had a child ("the half sibling"), who was born in June 2019. The child and the half sibling shared a bedroom, and the house had a dedicated playroom for them.

The father's wife ("the stepmother") testified that she married the father in August 2019 and had been involved in the child's life since he was approximately one or two years old. She testified that she had two children of her own, had been divorced from her previous husband since 2017, and exercised joint custody of her children pursuant to a week-on/week-off custodial schedule. The father testified that he had resided in the same house since approximately 2018 or 2019, that the child had his own bedroom there, and that the child kept clothing and other personal belongings at the residence.

The mother described the fiancé as "absolutely" a father figure to the child, testified that the child spent a lot of time with him, and stated that the fiancé contributed financially to the household. The fiancé testified that he had been involved in the child's life since the child was approximately one year old. He testified that he was engaged to the mother, although they had not yet set a wedding date. He testified that he gave the mother access to his personal funds to support and maintain the mother, the half sibling, and the child.

The fiancé testified that, on a daily basis, he served as a role model for the child by getting up each morning, going to work, and

demonstrating consistency. He said that he and the child regularly played together. He testified that he and the child would "aggravate" one another and that those interactions reflected how they got along, explaining that both were generally in "great mood[s]" during those interactions.

The fiancé testified that he and the mother had experienced disagreements during their relationship and had separated on one occasion. He testified, however, that those disagreements had not been frequent occurrences and had not occurred on a weekly basis. The fiancé also testified that he had two children of his own, including a sixteen-year-old son with whom he did not exercise custodial time. According to the fiancé, during what he described as a hard time in his life, he had decided to "pull away" from that relationship.

The father testified that he did not consider the fiancé to be a stepparent because the fiancé and the mother were not married, and, in his view, the fiancé's relationship with the child lacked permanence because the fiancé could leave the relationship at any time. He testified that the issue he had with the fiancé was that, if the fiancé was going to be a stepfather to the child, then he should marry the mother and be a

stepfather. He further said that, if the fiancé was going to help raise the child, then he should raise him properly. The father further testified that the child needed a father figure in his life and that, in his view, the child did not have one in the mother's household.

The stepmother testified that, in her opinion, the fiancé was not a father figure to the child "because [he was] not even a father to his own two kids," and she further stated that, in her opinion, the fiancé was not a father figure to the half sibling because he did not "show up to things." She testified that the fiancé was often absent at many of the child's activities and that her opinion regarding his role as a stepfather was based on "what he shows up to for" the child.

The mother testified that she had observed the fiancé raise his voice to the child; however, she said, she had never heard him raise his voice in a manner that caused her concern for the child's well-being, and she had never asked him to lower his voice when speaking to the child. The fiancé testified that he had spanked the child in the past, but he believed that it had occurred only once, could not recall when it occurred, and denied having ever used a belt. He testified that he had raised his voice to the child on "numerous" occasions to get the child's attention,

8

particularly when the child was engaging in conduct that could result in harm to himself or others. He further testified that he had used profanity when speaking to the child to get his attention, giving as an example, "damn it, son, I told you." The fiancé also testified that, if the father objected to spanking the child, he would agree not to spank the child in the future.

The father testified that he did not have a problem with the fiancé's disciplining the child and that he expected another responsible adult to correct the child's behavior if neither parent was present. He explained that his view regarding spanking depended on the circumstances and the reason that the child needed to be spanked. The father testified, however, that his main concern was that, if the fiancé was going to discipline the child, he needed to be "the entire part of stepdad" and not merely "pay bills and whoop him."

The stepmother testified that the primary behavioral issues she had observed with the child involved the child's having "an attitude" or a "smart mouth." She testified that she participated in disciplining the child and had administered corporal punishment in the past, although she could not recall the last occasion on which she had done so. When

asked whether she had ever cursed at the child, she testified, "I'm sure I have, yes," but stated that she could not recall a specific occasion and that it was not her "nature" to curse at a child or to do so out of frustration. The father testified that he had observed "bickering and arguing" between the stepmother and the child and that he supported the stepmother's "putting her foot down" because he did not want the child being disrespectful to an adult.

The mother testified that the child was very smart, remained on track academically, had no learning disabilities, and had not experienced significant behavioral problems at school. The father likewise testified that the child had great grades, was doing well in school, and had not developed any learning disabilities, physical-health conditions, or mental-health diagnoses since the entry of the 2021 modification judgment. He further testified that the current custodial schedule was not affecting the child's school performance, and he confirmed that the mother supported the child's extracurricular activities "to an extent."

The mother testified that, during the pendency of the action, she had enrolled the child in counseling because he had been short-tempered and combative after returning to her home following extended weekends

with the father. She testified that the father told her that the child did not need therapy. According to the mother, the child had shown significant improvement since beginning counseling and had learned ways to manage his anger and talk about his feelings.

The mother testified that the child had previously participated in football and was participating in baseball at the time of trial. The father testified that he served as the child's baseball coach and saw the child at practices and games. He testified, however, that he did not consider coaching baseball to be parental time or "extra time" with the child because it was not "one-on-one" time and he had other responsibilities while coaching.

The stepmother testified that she served as the baseball team's "team mom" and attended the child's practices and games. The mother likewise testified that she attended the child's practices and games and had attended all but one of the child's practices during both the previous season and the current season. The father testified that he attended the child's extracurricular activities during both parties' custodial periods and attempted to attend school events, including field trips, regardless of which parent had custody at the time. The father further testified that,

11

before commencing the present action, he would pick up the child from school and take him to practice. He further testified that the fiancé had become more involved in the child's activities during the litigation by attending baseball games and similar events, but, he said, before the pending modification action was commenced, he had never seen the fiancé at the child's activities.

The mother testified that, from the entry of the 2021 modification judgment until the commencement of the present action, there were periods during which she and the father had communicated and coparented effectively. She testified, however, that the father's conduct would vary and that, at times, he would "push" and "harass" her via text messages; she said that he had called her derogatory names on telephone calls, including "bitch" and "stupid bitch," sometimes in the child's presence.

The mother acknowledged that she had blocked the father's telephone number on two occasions, including around June 2019 and for twenty-one days in April 2024. She testified, however, that she had blocked only the father's direct communication with her, not communication between the father and the child. According to the

12

mother, although the child did not have a telephone in April 2024, he had remained able to communicate with the father through her work telephone, and she said that he was able to call the father anytime he needed to. She further testified that she had blocked the father from texting her but had not blocked him from communicating by e-mail.

The mother testified that, when the child was in the father's care, the father provided the child with a second cellular telephone and that she had the telephone number for that telephone and was able to call and text it. She further testified that, before the commencement of the current modification action, she believed that her telephone number had been blocked on that telephone because her calls went straight to voicemail on multiple occasions and that she later "unblocked" her telephone number at a baseball practice.

The father testified that, when the parties disagreed or became upset with one another, he would either "get[] [his telephone number] blocked" or the mother would refuse to allow him any additional custodial time beyond that provided in the court order. He further testified that, when the parties were getting along, the mother would "throw a bone here and there" by allowing him an extra day, an extra hour, or other

additional time with the child. The father testified that, although the 2021 modification judgment provided for a 6:00 p.m. exchange time, that provision had not been enforced since the entry of that judgment until the pending action had been commenced. He testified that, after he had commenced the pending action, the mother had begun enforcing the 6:00 p.m. exchange time.

The father testified that the issues between him and the mother had "gotten worse" and were "pretty bad." He further testified that, from 2018 through the time of trial, the parties had experienced periods of positive communication, including "good months" and "good weeks," followed by conflicts that caused their relationship to deteriorate again. According to the father, the parties would have a couple of good months, then something would happen, one of them would become upset, and "everything [would blow] back up," resulting in blocked telephone communication, periods of three or four months without speaking, and later attempts to get back on track.

The mother testified that she did not want to eliminate the father's Monday custodial periods because she knew that the child needed to see the father, but she believed that that schedule made the week "choppy"

because the Monday custodial period occurred at the beginning of the school week. She testified that "every other weekend would make things a little easier for everyone," including the child. The mother confirmed that the father was a good father, that the child needed his father, and that she was not asking the trial court to reduce the father's custodial time. She testified, however, that the child needed structure.

The stepmother testified that, in her opinion, the child had a more structured routine during the summer under the week-on/week-off custodial schedule and that she noticed a difference in his demeanor, particularly regarding his attitude, between the academic year and the summer. The father likewise testified that a week-on/week-off schedule would benefit the child by eliminating what he described as a "choppy schedule" and reducing the amount of back-and-forth between households. He testified that such a schedule would allow him to spend more time with the child, while still providing the mother with equal time, and he acknowledged that both his parenting and the mother's parenting were important to the child.

Regarding child support, the parties stipulated that annual income of $65,000 would be imputed to the mother for purposes of calculating

child support. The mother testified that she remained at home with the children, but she acknowledged that she was capable of working and did not object to recalculation of child support using imputed income.

The father testified that he owned and operated a business known as 1229 Construction and that that business served as his primary source of income. He acknowledged that his 2020 tax return reflected adjusted gross income of $93,590.49, that his 2021 tax return reflected adjusted gross income of $146,756, and that his 2022 tax return reflected adjusted gross income of $124,227. The father testified that his income had decreased substantially in 2023 and estimated that his income for that year was approximately $35,000 to $36,000.

The mother testified that the child had been continuously covered by Medicaid since his birth. The stepmother testified that she maintained health-insurance coverage through her employer, that both she and the father were covered under the policy, and that the father had asked the mother, when he was added to the stepmother's policy, to also add the child. She testified that she paid approximately $375 every two weeks for coverage for herself, the father, and her two children and that her premium would not increase if the child were added to the policy.

16

However, according to the stepmother, the mother declined to have the child added to the policy because the mother believed it would interfere with Medicaid and cause a loss of benefits.

On July 18, 2025, the trial court entered a CS-42 Child-Support Guidelines form reflecting that it had determined the father's gross monthly income to be $13,937, his monthly income available for support to be $11,013, and his recommended child-support obligation to be $1,299 per month. The form further reflected that the mother's share of the parties' combined adjusted gross income was twenty-eight percent and the father's share was seventy-two percent.

On July 22, 2025, the trial court entered a final judgment granting in part and denying in part the parties' respective petitions for a rule nisi and for modification, finding both parties in contempt, and ordering them to attend and successfully complete at least twenty-four coparenting-therapy sessions within twenty-four months. With respect to child support, the trial court imputed monthly income to the mother in the amount of $5,417 based on the parties' stipulation and determined that the father's average gross monthly income was $13,937, which it stated was "based upon an average of the gross income of [the father] minus

ordinary and necessary expenses as determined by his tax returns for the years 2020, 2021, and 2022." Using those income figures, the trial court calculated the father's child-support obligation to be $1,299 per month.

The final judgment also modified certain financial and custodial provisions contained in the prior judgments. It required the father to provide health-insurance coverage for the child, authorized him to add the child to the stepmother's health-insurance policy, and allocated responsibility for the child's uninsured medical expenses at twenty-eight percent to the mother and seventy-two percent to the father. The trial court further modified the parties' Christmas and birthday custodial schedule.

The father filed a postjudgment motion to alter, amend, or vacate the judgment or, alternatively, for a new trial. In that motion, the father challenged the trial court's determination of his income, the resulting child-support calculation, the allocation of uninsured medical expenses, the custodial schedule, and certain holiday-visitation provisions. The trial court conducted a hearing on the father's motion, after which it entered an amended final judgment modifying the Christmas, Thanksgiving, birthday, custodial, and child-support provisions

18

contained in the judgment. With respect to Christmas visitation, the amended judgment provided that, in odd-numbered years, the father would exercise visitation from the day school was released until December 25 at 2:00 p.m. and that the mother would exercise visitation from December 25 at 2:00 p.m. until January 1 at 2:00 p.m., with the schedule reversing in even-numbered years. The amended final judgment also modified the Thanksgiving schedule, provided birthday visitation for the noncustodial parent, and revised the father's custodial periods to begin at 3:00 p.m. on Fridays and Mondays rather than at 6:00 p.m. Finally, the trial court reduced the father's child-support obligation from $1,299 per month to $1,253 per month.

The mother filed a motion to alter, amend, or vacate the amended final judgment, which the trial court denied. The father filed a timely notice of appeal.

Standard of Review

"'"'Our standard of review is very limited in cases where the evidence is presented ore tenus.'"'" Gordon v. Gordon, 231 So. 3d 347, 352 (Ala. Civ. App. 2017) (citations omitted). A custody determination entered upon oral testimony is accorded a presumption of correctness on

appeal, and this court will not reverse that determination unless the evidence so fails to support it that it is plainly and palpably wrong or unless an abuse of the trial court's discretion is shown. Id. To substitute our judgment for that of the trial court would be to reweigh the evidence, which Alabama law does not permit. Id. "'It is also well established that, in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.'" Id. (citation omitted).

## Analysis

The father argues that the trial court should have modified the parties' custodial arrangement to a week-on/week-off schedule because, he says, material changes in circumstances had occurred since the entry of the 2021 modification judgment. Specifically, he relies on the child's transition from daycare to elementary school, the child's increased participation in extracurricular activities, the child's maturation and changing developmental needs, concerns regarding the fiancé and the mother's household, and ongoing communication and coparenting disputes between the parties. He further contends that his own

20

household offers greater stability and structure and that a week-on/week-off arrangement would materially promote the child's best interests.

Under Ex parte McLendon, 455 So. 2d 863 (Ala. 1984), a party seeking to modify a prior custody judgment must prove that (1) the party is a fit custodian, (2) a material change in circumstances affecting the child's welfare has occurred, and (3) the positive good brought about by the change will more than offset the inherently disruptive effect of uprooting the child. See Gordon, 231 So. 3d at 353. Alabama courts have repeatedly emphasized that the burden for a custody modification is intentionally stringent because "'[t]he need for stability in a child's life necessitates the requirement that the party seeking the modification prove to the court's satisfaction that "material changes affecting the child's welfare since the most recent [judgment] demonstrate that custody should be disturbed to promote the child's best interests."'" Courson v. Hurston, [Ms. CL-2024-0897, Aug. 22, 2025] ___ So. 3d ___, ___ (Ala. Civ. App. 2025) (quoting Hermsmeier v. McCoy, 591 So. 2d 508, 509 (Ala. Civ. App. 1991), quoting in turn Wood v. Wood, 333 So. 2d 826, 828 (Ala. Civ. App. 1976)).

The evidence established that the child had grown older, had progressed from daycare to elementary school, and had become more involved in extracurricular activities. However, the 2021 modification judgment expressly contemplated the child's future school attendance by requiring the father to return the child to "daycare or school" at the conclusion of his custodial periods. Thus, the child's transition to school was not a new or unforeseen circumstance arising after the entry of the 2021 modification judgment. This court has explained that a party seeking a custody modification must establish that a material change in circumstances has occurred since the entry of the prior custody judgment and that "'[a] material change of circumstances occurs when important facts unknown at the time of the initial custody judgment arise that impact the welfare of the child.'" Courson, ___ So. 3d at ___ (quoting K.E.W. v. T.W.E., 990 So. 2d 375, 380 (Ala. Civ. App. 2007)).

Likewise, the mere passage of time is not a basis for a custody modification. Cochran v. Cochran, 5 So. 3d 1220, 1229 (Ala. 2008). As our supreme court has explained, "'"[t]he fact that the children have grown older in and of itself is no sufficient change of condition to warrant a change in custody,"'" id. at 1229-30 (quoting Engler v. Engler, 455

22

S.W.2d 36, 41 (Mo. Ct. App. 1970), quoting in turn <u>Fordyce v. Fordyce</u>, 242 S.W.2d 307, 314 (Mo. Ct. App. 1951)), because "[t]he natural aging process is a 'contingency to be normally expected'" and is presumed to have been considered when the original custody judgment was entered. <u>Id.</u> at 1230 (quoting <u>Fordyce</u>, 242 S.W.2d at 314). Thus, the trial court reasonably could have concluded that the child's increased age, educational development, and extracurricular participation did not establish a material change in circumstances.

The trial court likewise could have concluded that the father's concerns regarding the fiancé failed to establish a material change in circumstances. The evidence demonstrated that the fiancé had resided with the mother since 2018, had been involved in the child's life for years, and was already a member of the mother's household when the parties entered into the modification agreement incorporated into the 2021 modification judgment. Consequently, his presence in the mother's home was not a new circumstance arising after the prior judgment. Although the father expressed concerns regarding the fiancé's disciplinary methods and role in the child's life, those concerns involved circumstances that either predated the 2021 modification judgment or reflected

disagreements regarding parenting practices rather than newly arising conditions affecting the child's welfare. Moreover, the father acknowledged that he did not object to the fiancé's disciplining the child in appropriate circumstances, and the evidence reflected that both households utilized similar disciplinary measures.

In addition, the trial court reasonably could have concluded that the evidence did not establish that a change in custody would materially promote the child's welfare. The record contains no indication that the child's welfare had deteriorated under the existing custodial arrangement. To the contrary, both parents testified that the child was doing well academically, maintaining good grades, remaining active in extracurricular activities, and enjoying strong relationships with both parents. The father himself testified that the child performed well in school and generally exhibited good behavior. Indeed, the only evidence of misbehavior concerned occasional disrespect, conduct for which both parties testified they disciplined the child. Thus, rather than demonstrating a need for a custody modification, the evidence showed that the child was thriving under the existing arrangement.

The father's remaining complaints primarily concerned communication difficulties, visitation disputes, and the mother's alleged interference with his relationship with the child. However, Alabama courts have recognized that custody modification is not the proper remedy for visitation disputes. See Cochran, 5 So. 3d at 1228-29. Here, the evidence demonstrated an ongoing coparenting conflict between both parties, and the trial court ultimately found both parties in contempt for communication-related violations. Those mutual communication difficulties are "best characterized as an alleged lack of cooperation, which is generally an insufficient basis on which to modify custody." S.L.L. v. L.S., 47 So. 3d 1271, 1279 (Ala. Civ. App. 2010) (holding that allegations involving communication difficulties and failures to keep the other parent informed of school and medical matters, even if true, did not constitute the type of material change in circumstances necessary to justify a custody modification). Likewise, the mother's refusal to continue granting custodial time beyond that required by the 2021 modification judgment did not constitute a material change in circumstances. See E.F.B. v. L.S.T., 157 So. 3d 917, 924 (Ala. Civ. App. 2014) (holding a

25

parent's adherence to the existing custody arrangement, without more, is not a basis for modifying custody).

Ultimately, the father's evidence established that the child had grown older, that he had entered school as anticipated by the 2021 modification judgment, that he had become more involved in extracurricular activities, and that the parties had continued to experience communication and coparenting difficulties. The trial court reasonably could have concluded that those circumstances did not rise to the level of a material change in circumstances affecting the child's welfare required by <u>McLendon</u>. Because the father failed to satisfy that threshold requirement, the trial court acted within its discretion in declining to modify physical custody.

The father next contends that the trial court abused its discretion in calculating child support. Specifically, he contends that the trial court improperly determined his monthly gross income, failed to consider his most recent income information, and failed to properly account for health-insurance coverage provided through the stepmother's employer.

To the extent that the father argues that the trial court erred by failing to rely on his alleged 2023 income, the record does not support

reversal on that basis. Rule 32(F), Ala. R. Jud. Admin., provides that "[i]ncome statements of the parents shall be verified with documentation of both current and past earnings." However, the record on appeal includes neither the father's complete 2023 tax return nor any indication that it was admitted into evidence. At the postjudgment hearing, the trial court specifically questioned the father's attorney regarding whether the 2023 return had been admitted, and the father's counsel was unable to confirm that it had been. Instead, the record contains only the father's testimony estimating his 2023 income. A trial court "'"is not bound by the income figures advanced by the parties, and it has discretion in determining a parent's gross income."'" Whatley v. Whatley, [Ms. CL-2025-0151, Oct. 24, 2025] ___ So. 3d ___, ___ (Ala. Civ. App. 2025) (quoting Walker v. Lanier, 221 So. 3d 470, 473 (Ala. Civ. App. 2016), quoting in turn Morgan v. Morgan, 183 So. 3d 945, 961 (Ala. Civ. App. 2014)). Accordingly, the trial court was not required to accept the father's testimony estimating his 2023 income, and the father's argument on that point does not establish reversible error.

The father's challenge to the income figure the trial court ultimately used to calculate child support, however, has merit. The trial

court found that the father's gross monthly income was $13,937 and expressly stated that it derived that figure from the father's 2020, 2021, and 2022 tax returns. In cases involving self-employment income, Rule 32(B)(3)(a), Ala. R. Jud. Admin., provides that "'gross income' means gross receipts minus ordinary and necessary expenses required to produce [that] income." Rule 32(B)(3)(b) further provides that "'[o]rdinary and necessary expenses' does not include amounts allowable by the Internal Revenue Service for the accelerated component of depreciation expenses, investment tax credits, or any other business expenses determined by the court to be inappropriate for determining gross income for purposes of calculating child support."

Although the trial court identified the evidence upon which it relied, neither its judgment nor the accompanying CS-42 form reveals how it converted the information contained in the father's 2020, 2021, and 2022 tax returns into a gross monthly income of $13,937. This court has attempted multiple calculations using the income figures reflected in those returns and the provisions of Rule 32 governing self-employment income, but none of those calculations yields the figure the trial court adopted. This court has reversed child-support judgments when it could

28

not determine from the record how the trial court calculated the child-support obligation. See, e.g., Nelson v. Landis, 709 So. 2d 1299, 1300 (Ala. Civ. App. 1998) ("This court is unable to determine, from the record and from its own calculations of the various potential obligations, how the trial court determined the father's child-support obligation.").

The father's separate argument regarding health-insurance premiums does not independently warrant reversal. Rule 32(B)(7)(d) provides that health-insurance costs are to be "divided between the parents in proportion to their adjusted gross income" as reflected on the applicable CS-42 form. Rule 32(B)(7)(e) further provides that the health-insurance cost attributable to the child is calculated by dividing the total health-care-coverage cost actually paid by, or on behalf of, the parent providing the coverage by the total number of covered individuals and then multiplying that figure by the number of children who are the subject of the support order.

Unlike the father's income calculation, the record provides a sufficient basis to determine how the trial court accounted for the child's health-insurance coverage. Although the CS-42 form is not entirely clear and the trial court did not expressly explain its methodology, the record

reflects that the trial court included the cost attributable to the child's health-insurance coverage in the total child-support obligation, allocated that obligation according to the parties' respective income shares, and then credited the father for paying the health-insurance premium. When calculated in that manner, the resulting child-support obligation is $1,253 per month, as set forth in the amended judgment. Thus, despite any apparent discrepancies on the face of the CS-42 form, the record supports the conclusion that the trial court properly accounted for the child's health-insurance expense. Nevertheless, because we reverse the trial court's determination of the father's income, the child-support obligation must be recalculated on remand, and the health-insurance calculation will necessarily be revisited as part of that recalculation

Accordingly, the father's argument regarding his alleged 2023 income does not establish reversible error, and the record supports the trial court's apparent adjustment for health-insurance coverage. Nevertheless, because the record does not disclose how the trial court derived the father's gross monthly income of $13,937 from the evidence it expressly identified, this court cannot determine whether the child-support award complies with Rule 32. The judgment is therefore due to

be reversed insofar as it calculated the father's child-support obligation, and the cause must be remanded for the trial court to recalculate child support in compliance with Rule 32 and to clearly identify the basis for its income determination.

<u>Conclusion</u>

Based on the foregoing, we affirm the trial court's judgment as to the issues of child custody and contempt, we reverse that portion of the judgment concerning the child-support award, and we remand the case to the trial court for it to recalculate that award.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Hanson and Bowden, JJ., concur.

Edwards, J., concurs in the result, without opinion.